## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **JOHN ASHBURN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 09−cv−0373−DRH−SCW** |
| | ) | |
| **DONALD GAETZ,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### MEMORANDUM AND ORDER

**HERNDON, Chief Judge:**

### I.   Introduction

In 1995, petitioner John Ashburn was convicted of first-degree murder in the death of Rick Muckenstrum in St. Clair County, Illinois, and sentenced to seventy-five years of imprisonment (case no. 93-CF-547).   Mr. Ashburn, who is currently serving that sentence at Illinois' Menard Correctional Center, has brought the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Ashburn claims he is entitled to habeas relief for seven distinct reasons:[1]

1. Ashburn's trial counsel was ineffective by failing to properly cross-examine Dr. Parks, the pathologist who performed the autopsy on Muckenstrum;

2. His counsel on direct appeal was ineffective;

3. The jury that convicted him was not fair and impartial;

---

[1] For consistency's sake, the Court will use the same enumeration of Ashburn's proposed grounds for relief in the analysis below.

4. The trial court's introduction of irrelevant and prejudicial evidence amounted to a denial of his due process rights;

5. The prosecutor elicited — and did not correct — testimony from Earl Kelly that the prosecutor knew to be perjured, in violation of Ashburn's due process rights;

6. The prosecutor elicited — and did not correct — perjured testimony from Dr. Harry Parks, who performed the autopsy on Ashburn's victim; and

7. The State of Illinois improperly broadened Ashburn's indictment to include a different theory of offense in the jury instructions after the evidence was closed, thereby violating Ashburn's Fifth, Fourteenth, and Sixth Amendment rights.

For the following reasons, Ashburn's petition (Doc. 1) is **DENIED.**

## II.   Factual and Procedural Background

The facts determined by a state court are presumed to be correct in the absence of clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e); *Badelle v. Correll*, 452 F.3d 648, 659 (7th Cir. 2006). The following factual background relating to the instant petition has been taken from the Rule 23 unpublished direct appeal decision on petitioner's case rendered by the Illinois Fifth District Appellate Court on June 25, 1997 (case no. 5-95-0449), and from the appellate court's Rule 23 Order affirming the denial of Ashburn's petition for postconviction relief (case no. 5-06-0405).

### A. Jury Trial

Ashburn was convicted of first-degree murder in 1995. The Illinois appellate court summarized his trial as follows:

. . . John Ashburn, and his codefendant, Dave Clark, were charged with the murder of Rick Muckenstrum. Clark was convicted of the

murder in a . . . jury trial, and Clark's conviction was upheld on appeal. *People v. Clark*, No. 5-94-0350 (August 14, 1996) (unpublished order under Supreme Court Rule 23 (134 Ill. 2d R. 23)). [Ashburn] was convicted by a jury for the same offense, and the court imposed a 75-year extended-term prison sentence. . . .

At trial, Melanie Collins, [Muckenstrum's] live-in girlfriend of nine years, testified that at the end of June or early July of 1990, she, Muckenstrum, and about six or seven other persons, including [Ashburn], went on a camping trip to Missouri. [Ashburn] loaned [Muckenstrum] money to go on the trip. At the campsite, many of the people were drinking. An argument broke out between [Ashburn] and [Muckenstrum] and continued for several hours. Collins and [Muckenstrum] decided to leave in Collins's car. [Ashburn] yelled at [Muckenstrum] to get out of the car or [Ashburn] was going to kill him. [Ashburn] also broke the window on the passenger side where [Muckenstrum] was sitting.

A few days after the camping trip, [Ashburn] came to Collins's apartment looking for [Muckenstrum]. According to Collins, [Ashburn] kicked her door open and told her he wanted her "old man" and that [Ashburn] was going to kill him.

Collins last saw [Muckenstrum] on July 10, 1990, when he left with Bobbie Johnston, Pete Parker, and Clark to go drinking.

L.T. Cook testified that on July 11, 1990, at about 3 p.m., he and a friend, Willie, went to Willie's chicken farm. As they went up the gravel road, Cook saw [Muckenstrum's] body laying in the grass next to the road. Cook reported his finding to the police.

Richard Aulabaugh testified that he owned a bar, called The Bar. On July 10, 1990, Aulabaugh first noticed that [Ashburn, Muckenstrum], and Clark were in the bar because [Ashburn] was arguing with [Muckenstrum] in a loud and offensive manner. After about 15 minutes, the three were asked to leave because other patrons complained.

Through a picture window of the bar, Aulabaugh saw [Ashburn's] truck, which was backed into a parking space in front of the bar. He watched the three men leave and observed that all three went around the front of the truck to the passenger side. Clark stepped past the passenger door, opened the door, and [Muckenstrum] got in the middle of the truck. Clark got in the passenger seat, whereupon

[Ashburn] closed the door and went back to the driver's side. According to Aulabaugh, [Ashburn] continued to argue with [Muckenstrum], as Aulabaugh saw [Ashburn] shaking his finger and talking to [Muckenstrum] in the truck.   The three men left Aulabaugh's bar somewhere between 4:30 and 5 p.m.

Aulabaugh testified that, while in the bar, he overheard [Ashburn's] discussion with [Muckenstrum] about money.   Aulabaugh heard [Ashburn] say that he had a full tank of gas and that they were going to drive around until [Ashburn] got his money.

Sharon Russell, the barmaid at The Bar, testified that, on July 10, 1990, at about 5:15 p.m., she was working when [Muckenstrum] came into the bar with [Ashburn] and Clark.   Russell heard [Ashburn] arguing with [Muckenstrum] about $37 that [Muckenstrum] owed [Ashburn].   Because Russell received complaints from other patrons, Russell warned [Ashburn, Muckenstrum], and Clark to quiet down.   After 10 or 15 minutes more, Russell told the three to leave.

When [Ashburn, Muckenstrum], and Clark left the bar, Russell saw [Muckenstrum] sitting in the middle of the truck, with Clark in the passenger seat and [Ashburn] in the driver's seat.   Russell stated that [Muckenstrum] was wearing a yellow tank top and a pair of jeans that day.   Russell testified that, based upon her review of a photograph, the clothes [Muckenstrum] had on at the time of his death were the same clothes he had on in the bar.

Dr. Harry Parks, a forensic pathologist, performed the autopsy on [Muckenstrum] on July 12, 1990.   Parks removed a bullet from [Muckenstrum's] head.   Parks testified that [Muckenstrum] received a bullet wound above his right eye, a half-inch stab wound on the right side of his neck, and a 5 ½-inch-deep slash wound in the upper right quadrant of his abdomen, which allowed the colon to protrude. Parks found blackening around the gunshot wound, indicating that the wound was made at close range.   Parks found very little blood, and he stated that the lack of blood around a nick in the renal artery indicated to him that [Muckenstrum] did not live very long after the gunshot wound to the brain.   Although Parks determined that the immediate cause of death was the gunshot wound, Parks was unable to say with any medical certainty whether the gunshot wound or the knife wounds occurred first.   Parks testified that [Muckenstrum] had no defensive wounds on his hands and that a toxicology report

revealed that [Muckenstrum] had a blood-alcohol content of .4366 at the time of his death.

Deanie Hinchcliffe's testimony basically corroborated Collins's testimony about the camping trip to Missouri. Hinchcliffe testified that, during the argument at the campsite, [Ashburn] pulled a knife on [Muckenstrum].

Janice Walker testified that Clark rented a room from her two weeks before [Muckenstrum's] death. A day or two after the murder, Clark and [Ashburn] came to Walker's home in [Ashburn's] pickup truck to get Clark's clothing. Walker noted that [Ashburn's] truck was wet inside the cab and out, indicating to her that the truck had been recently washed.

Billy Lee Parker testified that he went on the Missouri camping trip, and he corroborated the others' testimony about the altercation between [Ashburn] and [Muckenstrum]. On July 10, 1990, Parker met [Muckenstrum], Clark, and Johnston at Collins's apartment somewhere between 9 and 10 a.m. They drank some beer then proceeded to several bars, ultimately ending up at Jimmy's Tavern, where [Ashburn] was also drinking. [Ashburn] and [Muckenstrum] began arguing over the money owed [Ashburn] by [Muckenstrum], and Parker told them to go outside and settle the argument "like men." At the side of Jimmy's Tavern, Parker was following [Muckenstrum[ to the back of the bar, when [Ashburn] came running around the corner with a .32-caliber Derringer in his hand. Parker placed himself between [Muckenstrum] and [Ashburn], and [Ashburn] shot between Parker's legs. Clark came up behind [Ashburn], took the gun and emptied it, then gave the gun back to [Ashburn]. [Ashburn] stated that was okay because he had some more bullets. After some shoving and pushing behind the tavern, everyone went back inside. About 4:30 p.m., [Muckenstrum] left Jimmy's Tavern with [Ashburn] and Clark in [Ashburn's] truck. [Muckenstrum] was sitting in the middle, between Clark and [Ashburn]. That was the last time Parker saw [Muckenstrum] alive.

Michael Hendrix's testimony also corroborated Collins's testimony about the argument between [Ashburn] and [Muckenstrum] and corroborated Parker's testimony about the events on July 10, 1990, at Jimmy's Tavern. Hendrix saw [Muckenstrum] leave Jimmy's Tavern with [Ashburn] and Clark in [Ashburn's] truck.

Hendrix testified that, earlier on July 10, 1990, he went with [Ashburn] and Brian Smith in [Ashburn's] truck to the bank and back to a bar. In [Ashburn's] truck, [Ashburn] showed Hendrix a gun [Ashburn] had purchased, a .32-caliber Derringer. Hendrix had seen Clark with a knife about two weeks before [Muckenstrum's] murder, when Hendrix was sharpening some kitchen knives at his home. Clark asked Hendrix to sharpen his knife.

Brian Smith testified that he often drove [Ashburn's] truck for [Ashburn]. Smith drove [Ashburn's] truck to the camping trip in Missouri. Smith's testimony of the argument between [Ashburn] and [Muckenstrum] at the campsite paralleled the other witnesses' testimony.

On July 10, 1990, Smith drove [Ashburn] to Missouri, where [Ashburn] purchased some .32-caliber bullets. Smith also saw a gun in [Ashburn's] glove box that day. Smith corroborated Hendrix's testimony about going to the bank with [Ashburn] and then returning to a bar. Smith, too, testified to the events at Jimmy's Tavern. Smith stayed at Jimmy's tavern when [Muckenstrum, Ashburn], and Clark left the bar. On cross-examination, Smith stated that he had never seen [Ashburn] clean his truck from the time [Ashburn] bought the truck until July 10, 1990, the last day Smith saw [Ashburn].

Dee Heil, a crime scene technician for the Illinois State Police, testified that he recorded and collected evidence from the scene where [Muckenstrum's] body was found. He arrived at the scene about 3:30 p.m. on July 11, 1990. Heil found a red plastic identification holder on the ground by [Muckenstrum's] feet. Inside the identification holder were two business cards, two union cards with [Ashburn's] name on them, two fishing licenses (1989 and 1990) with [Ashburn's] name on them, and a 1989 hunting license with [Ashburn's] name on it.

Heil attended [Muckenstrum's] autopsy, where he received the bullet removed from [Muckenstrum's] head. Heil took the bullet to the crime laboratory for testing. Heil also testified that he served a search warrant for [Ashburn's] home upon [Ashburn]. In the search of [Ashburn's] home, a knife and a knife box for a new knife, with a sales receipt dated July 14, 1990, were found. These objects were identified by Heil at trial and admitted into evidence.

James Hall, a forensic scientist for the Illinois State Police Crime Lab, testified that he specializes in firearms and tool mark

identification.    He   examined   the   bullet   removed   from [Muckenstrum's] body.   Hall determined that the .32-caliber bullet was fired from a Davis Industries Derringer or pistol.  Hall explained that to fire a Derringer, a person has to cock the hammer before he pulls the trigger.

Earl Patrick Kelly testified that he was currently serving a prison sentence in Springfield, Missouri.  Kelly knew [Muckenstrum] for a year prior to [Muckenstrum's] murder.  Kelly talked to [Ashburn] in 1992, at which time [Ashburn] told Kelly that [Ashburn] and Clark murdered [Muckenstrum].  [Ashburn] told Kelly that [Ashburn] and [Muckenstrum] argued over money owed to [Ashburn], that they left a bar, and that they went riding around.  According to Kelly, [Ashburn] told him that "the other guy stabbed [Muckenstrum] in the stomach, and then they took him to Brooklyn [where [Muckenstrum's] body was found] and dropped him off in a field and Clark told Ashburn to shoot [Muckenstrum] so he couldn't tell on him."  Kelly testified that [Ashburn] told him he shot [Muckenstrum] "in the eye," then [Ashburn] and Clark left and went to another bar.  [Ashburn] told Kelly he lost his fishing license when they disposed of [Muckenstrum's] body.

On cross-examination, Kelly said he and [Muckenstrum] were convicted for a burglary in which they both participated.   Kelly admitted he did not tell the authorities about his conversation with [Ashburn] until 1994, a couple of months before he was sentenced in Federal court.   Kelly stated he would have taken anything the authorities wanted to give him for the information, but he did not tell the police for that reason, and he received no benefit from his telling the police about the conversation.   Kelly said he told the police because he was a friend of [Muckenstrum's], he knew Collins, and he knew [Muckenstrum's] children.

Clarence Banks, an investigator for the Illinois State Police, testified that he investigated [Muckenstrum's] murder.  He corroborated that [Ashburn's] identification holder was found by [Muckenstrum's] body.  Banks's testimony established that the distance between The Bar, where [Muckenstrum] was last seen with [Ashburn] and Clark and where [Muckenstrum's] body was found, was approximately 2 ½ miles.

Robin Blaha, an Illinois State Police officer, participated in the investigation of [Muckenstrum's] murder.   On July 12, 1990, at about 11 a.m., Blaha, Banks, and Donald Leach, another State Police

officer, went to [Ashburn's] home.  When [Ashburn] opened the door, Blaha told [Ashburn] they needed to talk to [Ashburn] about an investigation involving [Muckenstrum].  Blaha asked [Ashburn] when was the last time he saw [Muckenstrum], to which [Ashburn] responded that it had been two weeks prior, on a camping trip. Blaha told [Ashburn] that they had been told that [Ashburn] was seen with [Muckenstrum] a couple of nights earlier, and [Ashburn] stated that he had been drinking with [Muckenstrum] then but that he had forgot.

The jury found [Ashburn] guilty of first-degree murder.  At [Ashburn's] sentencing hearing, the trial court determined that [Muckenstrum's] murder was brutal and heinous, thereby permitting the court to impose an extended-term sentence on [Ashburn].  The court found no factors in mitigation and, after considering the factors in aggravation, sentenced defendant to 75 years' incarceration.

(Doc. 13-1, pp. 11–19).

## B. Direct Appeal

In early 1997, Ashburn appealed his conviction and sentence:

On appeal, [Ashburn contended] that the trial court abused its discretion when it denied his motion for mistrial based upon a prejudicial newspaper article published during trial, thereby denying him a right to a fair trial; that the State failed to prove him guilty beyond a reasonable doubt; that the court erred in admitting irrelevant and prejudicial evidence [in the form of a knife, knife box, and receipt for a knife found at Ashburn's mobile home]; and that the court abused its discretion when it imposed an extended-term sentence of 75 years' incarceration.

(Doc. 13-1, p. 11).  The appellate court affirmed Ashburn's conviction and his

sentence.  Regarding the issue of whether a prejudicial newspaper article led to an

unfair trial, the Court reasoned:

Defendant contends that the court abused its discretion in not granting his motion for mistrial due to a newspaper article about the trial which appeared in the Belleville News Democrat on the morning of the second day of trial.  Defense counsel brought the newspaper

article to the court's attention.  Defendant asked that the court grant his motion for mistrial because of the article.

In the article, it stated that defendant drove a Corvette and that he was "bankrolled" by a back injury settlement, and that defendant had displayed [Muckenstrum's] body at a party at Pontoon Beach on the night of his killing.  The article also stated that it took five years to bring defendant to trial because [Ashburn] had threatened witnesses, and that these threats stalled the murder investigation.  It was also reported that a second man had been found guilty in this case and was serving an 80-year prison term.  The article discussed [Ashburn's] prior criminal history.

Before the trial commenced that morning, the court asked the jurors if anyone had read that morning's Belleville News Democrat.  One juror . . . admitted that he had read an article about defendant and the trial.  In chambers, the court inquired further about what [the juror] had read.  The court also asked [the juror] if he had discussed the article with any other jurors, if he had brought the newspaper to the jury room with him, or if [he] had seen a copy of the paper in the jury room.  [The juror] responded negatively to these three questions.  Because [he] read the article and recalled some of the details, [the juror] was excused from the jury and replaced by an alternate juror.

Back in the court room, the court again asked the jurors if any of them had read the newspaper that morning.  Another juror . . . stated that he read the sports page, but when he saw [Ashburn's] picture and an article about the trial in the newspaper, he "threw" the newspaper aside and did not read the article.  [That juror] remained on the jury panel, and the court denied defendant's motion for mistrial.

Defendant contends that the court did not conduct a meaningful examination of [the second juror] in chambers and outside of the presence of other jurors, and that the court failed to discern whether [the second juror] was influenced or prejudiced by the article.  [Ashburn] claims that this failure by the court to pursue a more in-depth query of [the second juror] makes the conclusion that the jury was not tainted speculative.  Defendant asserts that the court abused its discretion in denying his motion for mistrial, and that he was denied his right to due process and to a trial by a fair and impartial jury.

A court's ruling on a motion for mistrial because of prejudicial publicity is left to the sound discretion of the trial court, and only an abuse of that discretion warrants a reversal on appeal. *People v. Hicks*, 134 Ill. App. 3d 1031 (1985). Prejudicial error does not result every time extraneous or unauthorized information reaches the jury. *Hicks*, 134 Ill. App. 3d 1031. Each case is determined by examining the particular facts and circumstances, and the primary question is whether the jurors have been influenced and prejudiced to such an extent that they would not or could not be fair and impartial. *Hicks*, 134 Ill. App. 3d 1031. The nature and character of the allegedly prejudicial publicity is the most controlling factor to be considered by the court in making its ruling. *Hicks*, 134 Ill. App. 3d 1031. However, the adequacy of the steps taken by the court to protect the defendant from the prejudicial effect of the publicity must also be considered. *People v. Kleiss*, 88 Ill. App. 3d 358 (1980).

. . . the trial court excused the juror that had read the article, but not until the court determined that the juror had not had contact with the other jurors about the article. The court also questioned the jury a second time about reading the newspaper, thereby eliciting [the second juror's] response. [The second juror] indicated he did not read the article.

Before the trial commenced, the trial court advised the jurors that only evidence presented at trial was to be considered by them and that they were not to read or listen to any publicity regarding the trial. Additionally, at the end of the second day of trial, the court admonished the jurors before leaving for the day as follows:

> "As I've admonished you before, if there's anything in the news print, and I think we've had reporters here from three newspapers at different times during today, there may be articles in the paper, so I'm forewarning you, there's two ways for a Court to avoid having jurors read anything, or listen to anything that's in the media, one is by asking and directing the jurors to do it, and I'm placing you on your honor and it is your duty to do it[;] the other is to sequester the jury overnight. I do not intend to do that.

> *** That's your obligation as jurors. And you have to continue with that obligation until this case is over."

Based upon the foregoing facts and circumstances, we do not find that the trial court abused its discretion in denying [Ashburn's]

motion for mistrial because of prejudicial publicity during trial. We agree that the article was prejudicial; however, the court ascertained that [the second juror] had not read the article. There is no need to further question a juror regarding prejudice if the juror has not read the article. The court adequately guarded defendant's right to a fair trial when it repeatedly admonished the jurors not to read or listen to any news media about the trial.

(Doc. 13-1, pp. 19–22). And regarding the district court's admission of the knife,

knife box, and receipt, the appellate court reasoned as follows:

Defendant contends that the court erred when it admitted into evidence a knife and knife box found at defendant's mobile home. Defendant claims that this was irrelevant evidence as there was no connection between the knife and the knife box and the crime. Additionally, the receipt with the knife box shows that the buck knife was purchased after the murder. Defendant claims that this evidence was prejudicial and irrelevant and denied defendant a fair trial.

Admission of evidence is a matter left to the sound discretion of the trial court, and absent an abuse of discretion, the court's decision will not be overturned on review. *People v. Hoffstetter*, 203 Ill. App. 3d 755 (1990). Evidence is relevant if it has any tendency to make the existence of any material fact more probable or less probable than it would be without the evidence. *People v. Anderson*, 237 Ill. App. 3d 621 (1992). Evidence of a weapon, even if it is not the particular weapon actually used, may be admitted into evidence if there is proof to connect the weapon with the defendant and the crime. *Anderson*, 237 Ill. App. 3d 621. If a proper connection to the crime is shown and it is shown that defendant possessed a weapon which could have been used in the commission of the crime, the weapon may be admitted into evidence. *Anderson*, 237 Ill. App. 3d 621. The State argues that this is the case here.

We agree with [Ashburn] that the admission of the knife, the box, and the receipt were irrelevant and were prejudicial, for there was no evidence connecting defendant's possession of these items with the murder. Neither the gun nor the knife used in [Muckenstrum's] murder were found. No testimony as to the type of knife or to the size of the knife used in the murder was elicited at trial. The evidence presented linked defendant only with the gun used in [Muckenstrum's] murder. Thus, the court abused its discretion in admitting this evidence. However, because the evidence against

> [Ashburn] was overwhelming, we find the error harmless and reversal is not mandated. *People v. Ciccia*, 236 Ill. App. 3d 265 (1992).

(Doc. 13-1, pp. 24–25).

Ashburn filed a petition for leave to appeal the appellate court's decision.  The Illinois Supreme Court denied that petition on October 1, 1997. (Doc. 13-2).

### C. Ashburn's Petition for Postconviction Relief & Appeal

In 1998, Ashburn filed a *pro se* petition for postconviction relief in the circuit court of St. Clair County.  (Doc. 13-3, pp. 1–13).  After the trial court appointed counsel, an amended postconviction petition was filed in 2001, and an evidentiary hearing was held in 2006.  At the evidentiary hearing,

> Dennis Higgins, a retired investigator for the Illinois State Police, testified that during his investigation into [Muckenstrum]'s murder in 1990, he spoke with potential confession witness Earl Patrick Kelly, who had already provided testimony favorable to the State in the trial of [Ashburn's] codefendant, David Clark, and who wished to testify against the defendant.  Higgins testified on cross-examination that no promises of leniency were made to Kelly.  Dennis Hatch, who was a prosecutor in St. Clair County at the time of the defendant's trial, testified that he made no promises to secure the testimony of Kelly, and he denied that he had suborned perjury during [Ashburn's] trial. Keith Jensen, who was also a prosecutor in St. Clair County at the time of [Ashburn's] trial, testified that he made no promises to Kelly and that there were "no deals, there were no negotiations, and [Kelly's attorney] did not ask for anything in particular or specifics" but that "[i]t was understood that his cooperation would be brought to the attention of the U.S. Attorney's office."  Jensen also testified that in the past, the United States Attorney's office had "on occasion cooperated and reduced" a defendant's recommended sentence but that in other cases, where Jensen had requested consideration for someone who had testified, "they have totally ignored it."

(Doc. 13-1, p.2).

In July 2006, the trial court denied Ashburn's postconviction petition; he appealed that decision the same month.  (*See* Doc. 13-1, p. 2).  As is relevant here, Ashburn raised the five following points — all of which were rejected by both the trial and the appellate court — in his postconviction petition and his 2006 appeal.  (See Doc. 13-4; Doc. 13–5, pp. 11–49; Doc. 13–1, pp.1–10).

First, Ashburn claimed his trial counsel was ineffective for failing to adequately investigate and cross-examine Earl Kelly regarding Kelly's prior criminal history and whether Kelly received "special consideration" for his testimony against Ashburn.  The appellate court held that

> . . . the record belies [Ashburn's] contentions.  During the direct examination of Kelly at [Ashburn's] trial, Kelly testified that he was incarcerated in Springfield, Missouri, and that he had prior felony convictions for burglary, theft, and possession of a firearm by a felon. Kelly also testified that he had prior misdemeanor convictions for theft.  Apparently [Ashburn] believes that his counsel should have forced Kelly to admit, on cross-examination, that he had two felony convictions for theft and two felony convictions for burglary.  We agree with the State that because the jury was already aware that Kelly had prior felony convictions for burglary, theft, and possession of a firearm by a felon, as well as prior misdemeanor convictions for theft, the defendant was not prejudiced by his counsel's decision not to go into greater detail on cross-examination about the exact nature and number of Kelly's prior convictions.  With regard to [the] "special consideration" argument, we note that the defendant's counsel examined Kelly extensively about what kind of leniency Kelly might hope to get in his own case as a result of his testimony against [Ashburn] and that on redirect examination [the prosecutor] questioned Kelly in even greater detail about whether he had received any promises or special consideration on the basis of his testimony against the defendant.  Moreover, given the overwhelming evidence of the defendant's guilt in [Muckenstrum's] murder and given the parade of other witnesses who testified, in detail, about the confrontations between [Ashburn] and [Muckenstrum] prior to the murder, Kelly's testimony played a very small part in the overall case

against [Ashburn].   There was no error on the part of [Ashburn's] trial counsel, and [Ashburn] did not receive ineffective assistance of trial counsel.

(Doc. 13-1, 3–4).

Second, Ashburn sought relief for ineffective assistance of appellate counsel, whom he claimed should have raised the State's purported violation of Ashburn's right to a speedy trial.   The appellate court found that argument lacked merit:

At a pretrial hearing on this specific issue, [the trial judge] found that because [Ashburn] was in the custody of the Illinois Department of Corrections (DOC), serving a sentence in an unrelated case, when he was arrested in [the murder case], his speedy-trial rights were governed by the intrastate detainers statute.   Under that statute, now and at the time of [Ashburn's] arrest, the speedy-trial rights of an individual incarcerated in the DOC on an unrelated charge are controlled by subsection (b) of the speedy-trial provisions of the Code of Criminal Procedure of 1963 (speedy-trial statute) (725 ILCS 5/103-5(b) (West 1992)).    730 ILCS 5/3-8-10 (West 1992); *People v. Wooddell*, 219 Ill. 2d 166, 171–72 (2006).   Under subsection (b) of the speedy-trial statute, a defendant possesses a 160-day speedy-trial right that begins to run upon the filing of a demand by the defendant. 725 ILCS 5/103-5(b) (West 1992).   Although the defendant attempts, in his reply brief, to place the responsibility on the State to begin the speedy-trial demand process, [Ashburn] cites no authority in support of his position, nor is this court aware of any such authority.   To the contrary, the plain language of both the speedy-trial statute . . . and the interstate detainers statute . . . places the burden on a defendant to makes such a demand, and it is undisputed that the defendant never filed a speedy-trial demand under the appropriate provisions of either statute.     It is also undisputed that from the time the defendant did file a demand on July 5, 1994 — under the incorrect, 120-day provisions of the speedy-trial statute — until the time of [his] trial, all continuances in this case were either at [Ashburn's] request or agreed to by defense counsel.   There is no merit in [Ashburn's] speedy trial claim, and appellate counsel was not ineffective for choosing not to raise the claim.

(Doc. 13-1, pp. 4–5).

The appeals court addressed third and fourth contentions — that the prosecutor acted improperly by eliciting perjured testimony from Dr. Parks and Earl Kelly — under controlling Illinois law:

> Illinois case law makes it clear that in criminal cases, the defendant bears the burden of proving that the State knowingly used perjured testimony. *People v. Trimble*, 220 Ill. App. 3d 338, 345 (1991). A defendant may not point to mere inconsistencies in testimony to establish the knowing use of perjured evidence, and any inconsistencies between the testimony of a witness and the purported improbability of that testimony go only to the weight and credibility of the evidence and are not sufficient to establish a knowing use of perjury. *Trimble*, 220 Ill. App. 3d at 346. In addition, a mere conflict between the testimony of a witness and a prior statement made by that witness does not establish that the witness has given perjured testimony. *Trimble*, 220 Ill. App. 3d at 346. To the contrary, for testimony to constitute perjury that results in reversible error, the defendant must show, by clear, convincing and satisfactory evidence, that the testimony was not merely false but was willfully and purposely falsely given. *Trimble*, 220 Ill. App. 3d at 346. In the case at bar, the defendant cites only mere inconsistencies in the testimony of Kelly [and] Dr. Parks . . . He presents no evidence that any testimony was willfully and purposely falsely given. Accordingly, [Ashburn] has failed to demonstrate by clear, convincing, and satisfactory evidence that the testimony in question was willfully and purposely falsely given, and we therefore decline to find that the State knowingly presented perjured testimony.

(Doc. 13-1, p. 6).

Finally, the appellate court dealt with Ashburn's fifth point on appeal: that the State "improperly added accountability as an element of the charge at the time of the trial and in jury instructions, when that element did not appear on the indictment." The appellate court concluded the claim had no merit:

> [A]ccountability is not an additional element of the charge of murder: rather, accountability for the conduct of another is an alternative means by which a conviction for an underlying crime may be

reached.  *People v. Hicks*, 181 Ill. 2d 541, 547 (1998).  There is no requirement that an indictment allege accountability.  *People v. Bates*, 16 Ill. 2d 290, 295 (1959).  Even the slightest evidence in support of a theory of accountability warrants the use of an accountability jury instruction.  *People v. Testa*, 261 Ill. App. 3d 1025, 1030 (1994).  There was no improper indictment in this case.

(Doc. 13-1, p. 9).

Ashburn filed a petition for leave to appeal the appellate court's decision on his postconviction relief petition.  The Illinois Supreme Court denied that petition on January 28, 2009.  (Doc. 13-5).

### D. Ashburn's § 2254 Petition

Ashburn filed the instant *pro se* petition for writ of habeas corpus in this district on May 15, 2009.  (Doc. 1).  As noted in Section I above, Ashburn proposes seven grounds for habeas relief:

1. Ashburn's trial counsel was ineffective by failing to properly cross-examine Dr. Parks, the pathologist who performed the autopsy on Muckenstrum;

2. His appellate counsel was ineffective for failing to raise Ashburn's right to a speedy trial on direct appeal;

3. The jury that convicted him was not fair and impartial, and he should have been granted a mistrial based on a prejudicial Belleville News Democrat story and the failure of the trial judge to fully examine jurors who saw the article;

4. The trial court's introduction of irrelevant and prejudicial evidence amounted to a denial of his due process rights;

5. The prosecutor elicited — and did not correct — testimony from Earl Kelly that the prosecutor knew to be perjured, in violation of Ashburn's due process rights;

6.  The prosecutor elicited — and did not correct — perjured testimony from Dr. Harry Parks, who performed the autopsy on Ashburn's victim; and

7.  The State of Illinois improperly broadened Ashburn's indictment to include a different theory of offense in the jury instructions after the evidence was closed, thereby violating Ashburn's Fifth, Fourteenth, and Sixth Amendment rights.

After three extensions of time were granted, the respondent filed his response in April 2010. (Doc. 13).  Magistrate Judge Proud ordered Ashburn to file a reply, which (after two more extensions were granted) he filed in June 2010. Attached to the reply brief is an affidavit signed by Andrea Smith, a former employee at the Federal Public Defender's Office in this district, who attests that an attached draft affidavit (Doc. 19, pp. 21–22) is true and correct.  The draft affidavit, in turn, indicates that Smith represented Earl Kelly from November 1993 through February 1997.  During that time, "Mr. Kelly at first chose not to plead guilty much less cooperate with the government.  Rather, he went to trial . . . and was convicted." (Doc. 19, p. 21).  Smith narrates further:

> After he was sentenced, Mr. Kelly informed me that he wanted to pursue the time-worn practice of trying to get his sentence reduced by cooperating with the government.  After hearing what he had to offer and making a preliminary assessment that his information sounded credible, I started the process of informing Assistant United States Attorney Steve Clark and various state authorities who might be interested in his information.
>
> In the federal criminal justice system, there is never any promise made by the U.S. Attorney's Office that a sentence reduction for cooperation is guaranteed, even for defendants who don't put the government to their burden of proving them guilty and quickly plead.  Rather, the U.S. Attorney's Office always retains the discretion to decide that a defendant was not entirely forthcoming or not helpful enough or tested dirty or any number of reasons that result in no

motion being made by the government to the federal judge to reduce a defendant's sentence.

Since Mr. Kelly went to trial he had even less of a guarantee than do most federal defendants who plead guilty with such . . . deals. Of course, I am sure I informed Mr. Kelly of the probabilities that he would get a sentence reduction if his information was good, believed by the government. And information about murders, even those in state court, of course is the gold standard. So although Mr. Kelly did not have any written deal with the government to testify against Mr. Ashburn, Mr. Kelly surely had an implied deal, vis-à-vis my representation to him.

The Smith affidavit is dated March 13, 2008.

Also attached to the reply brief are motions and correspondences from Kelly's federal criminal case (dated early 1995), indicating that Kelly's testimony against Ashburn (and his codefendant Clark) factored into the U.S. Attorney's Office's Rule 35 motion to reduce Kelly's sentence. At least one of those letters was considered by the circuit court when it denied Ashburn's postconviction petition on grounds that there was no prosecutorial misconduct as it pertained to Earl Kelly's testimony (See. Doc. 13-5, pp. 2–3).

Mr. Ashburn's petition is ripe for a decision. Having thoroughly reviewed the record, the Court rules as follows.

### III.   <u>Analysis</u>

Section 2254 permits federal courts to entertain an application for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added). But as a threshold matter, a habeas petition shall not be

granted unless the applicant has exhausted his State court remedies.  28 U.S.C. § 2254(b)(1)(A).

Ashburn's asserted grounds for relief will be taken in turn and, as discussed below, fail to earn him a writ of habeas corpus.  But first, the Court turns to Ashburn's claim that his trial counsel was ineffective — a claim that Ashburn has procedurally defaulted.

## A. Procedural Default – Ineffective Assistance of Trial Counsel

Ashburn's first purported ground for habeas relief is that he was deprived of his Sixth Amendment right to effective assistance of counsel because his attorney at trial "failed to properly impeach" and cross-examine Dr. Harry Parks, the pathologist who performed the autopsy on Rick Muckenstrum. Because an examination of the record indicates this is the first time Ashburn has raised the issue, it is procedurally defaulted and cannot support a finding that Ashburn is entitled to habeas relief.

Federal courts may not entertain a habeas petition from a prisoner in state custody unless the petitioner has first exhausted his available state remedies.  28 U.S.C. § 2254(b).  Inherent in a petitioner's obligation to exhaust his state court remedies is the duty to fairly present his federal claims to the state courts.  *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004).   Fair presentment requires the petitioner to assert his federal claim through one complete round of state-court review, *id.*, and contemplates that both the controlling legal principles *and the operative facts* must be submitted to the state

courts, *Hough v. Anderson*, 272 F.3d 878, 892 (7th Cir. 2001) (emphasis added). Determining whether a petitioner fairly presented his claims requires examining the arguments in his state appellate briefs.  See *Malone v. Walls*, 538 F.3d 744, 753–54 (7th Cir. 2008) (citing *Dye v. Hofbauer*, 546 U.S. 1, 3–4 (2005)).

Closely related to the exhaustion doctrine is the doctrine of procedural default.  *Perrequet v. Briley*, 390 F.3d 505, 514 (7th Cir. 2004). When a habeas petitioner has failed to fairly present to the state courts the claim on which he seeks relief in federal court, and the opportunity to raise that claim in state court has passed, the petitioner has procedurally defaulted that claim.  *Id.* The doctrine of procedural default is subject to two equitable exceptions: a procedural default will bar a federal court from granting habeas relief unless (1) the petitioner demonstrates cause for the default and prejudice resulting therefrom, or (2) he convinces the court that a miscarriage of justice would result if his claim were not entertained on the merits.  *Badelle v. Correll*, 452 F.3d 648, 661 (7th Cir. 2006); *Perrequet*, 390 F.3d at 514.

Here, Ashburn has exhausted some ineffective assistance of counsel claims in the Illinois courts, but those claims did not include the instant claim that Ashburn's trial counsel was ineffective for failing to properly impeach and cross-examine Dr. Parks.  A thorough examination of Ashburn's brief on direct appeal (Doc. 13-1, pp. 29–65) shows Ashburn did not raise ineffective assistance of counsel there.  Ashburn did raise ineffective assistance of trial (and appellate) counsel in his petition for postconviction relief (Doc. 13-3, pp. 9–12; Doc. 13-4,

pp. 1–3) and in his appeal from the circuit court's denial of that petition (Doc. 13-5, pp. 11–49).  But in his PCR petition and appeal, Ashburn only raised ineffective assistance of trial counsel as it pertained to his attorney's failure to impeach Earl Kelly (Doc. 13-3, pp. 9–10; Doc. 13-4, pp. 1–3; Doc. 13–5, pp. 21–22).  Though Ashburn raised his attorney's failure to impeach *Kelly* on state PCR review, he does not do so in his instant petition: he only questions his trial counsel's strategy pertaining to Dr. Parks.  And Ashburn's briefs in his state PCR petition and appeal contain *no mention* of the proposition that his trial counsel's failure to "properly impeach and cross examine pathologist Dr. Harry Parks" was so deficient as to rise to the level of a Sixth Amendment violation.  (*Compare* Doc. 13-3, Doc. 13-4 and Doc. 13-5 *with* Doc. 1, p. 13–14).

In other words, Ashburn has raised the broadly controlling legal issue of his counsel's effectiveness to the state courts, but he has not fairly presented to the State courts the operative facts at the heart of his instant assertion of ineffective trial counsel.  See *Hough*, 272 F.3d at 892.  Because Illinois courts have had no opportunity to review the instant claim, and his opportunity to raise it in a state collateral attack has passed, Ashburn's claim that his trial counsel was constitutionally ineffective for failing to properly cross-examine and impeach Dr. Harry Parks (Number 1 as enumerated above) is procedurally defaulted.  See *O'Sullivan v. Boerckel*, 526 U.S. 838, 844–45 (1999).  Though there are two equitable exceptions to the doctrine of procedural default, Ashburn fails to argue either.  The Court cannot, therefore, consider his claim.

See *Crockett v. Hulick*, 542 F.3d 1183, 1193 (7th Cir. 2008) (petitioner failed to argue either procedural default exception, so his procedurally defaulted claim not considered).   Insofar as his petition for habeas corpus is based on ineffective assistance of trial counsel, Ashburn's petition is **DENIED**.

### B. Ashburn's Non-Defaulted Claims

The authority of federal courts to issue habeas corpus relief for persons in State custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  *Harrington v. Richter*, --- U.S. ----, 131 S.Ct. 770, 783 (2011).  While § 2254 does not impose a complete bar on federal court relitigation of claims already rejected in state proceedings, the hurdle is a high one.  *Id.* at 786.  A court cannot grant a writ to a petitioner in State custody "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d).  *Accord Malone v. Walls*, 538 F.3d 744, 757 (7th Cir. 2008).

Under the "contrary to" clause, a writ may be issued only if the state court applied a rule that contradicts the governing law set forth by the Supreme Court or if the state court reached a different outcome based on facts materially indistinguishable from those previously before the Supreme Court.  *Morgan v.*

*Hardy*, 662 F.3d 790, 797 (7th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000)). Under the "unreasonable application" clause, a petitioner must show that the state court's decision unreasonably extended a rule to a context where it should not have applied or unreasonably refused to extend a rule to a context where it should have applied. *Morgan*, 662 F.3d at 797. And factual findings made by both the state trial court and the appellate court reviewing the trial record are presumed to be correct unless the petitioner rebuts the presumption by clear and convincing evidence. *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008).

On habeas review, a federal court should treat a state court's decision with "deference and latitude." *Harrington*, 131 S.Ct. at 785. The inquiry is not whether the state applied federal law incorrectly, but rather whether the state court applied federal law unreasonably. *Id.* (citing *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). A state court's determination that a claim lacks merit therefore precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. *Harrington*, 131 S.Ct. at 785 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). On a § 2254 petition, federal courts assess the decision of the last state court to rule on the merits of a prisoner's claim. *Franklin v. Sims*, 538 F.3d 661, 664 (7th Cir. 2008).

Bearing in mind the deference and latitude afforded state courts, this Court now turns to Mr. Ashburn's six remaining claims for relief.

### 1. Ineffective Assistance of Appellate Counsel (Ashburn's Claim 2)

Ashburn claims that, during the direct appeal of his conviction, his Sixth Amendment right to effective assistance of counsel was denied because appellate counsel "did not raise or argue . . . that his right to a speedy trial" was violated.  The Illinois courts' final say on this issue was the Fifth District Appellate Court's affirmance of the Circuit Court's denial of Ashburn's PCR petition.  The Appellate Court concluded there "is no merit in [Ashburn's] speedy trial claim, and appellate counsel was not ineffective for choosing not to raise the claim." (Doc. 13-1, p. 5).

To be granted relief here for ineffective assistance of counsel, Ashburn must establish that the state court's decision was contrary to clearly established federal law, or that it involved an unreasonable application of such law, or that it was based on an unreasonable determination of the facts in light of the record before the state court.  *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011).  The controlling federal law on the Sixth Amendment right to effective counsel is articulated in *Strickland v. Washington*.  Under *Strickland* and its progeny, demonstrating ineffective counsel requires a two-part showing: first that counsel's performance was deficient, and secondly that counsel's deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  *See also Harrington*, 131 S.Ct. at 789 ("The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (internal citations and quotation marks omitted).

Here, the state court concluded that appellate counsel was not ineffective, since an appeal based on Ashburn's speedy trial rights would have been fruitless.   (Doc. 13-1, pp. 4–5).   This Court cannot conclude that the appellate court's ruling was unreasonable.   Ashburn never filed a proper speedy-trial demand under the relevant Illinois statutes, and requests by Ashburn and his lawyer were the source of any delay in his trial even after an improper demand was made.   It was reasonable for the Fifth District Appellate Court to conclude Ashburn would have lost the issue on direct appeal even if his appellate counsel had raised it.   And such a holding is neither contrary to nor an unreasonable application of federal law.   Rather, the state court's holding aligns with *Strickland*'s rule that only deficient attorney performance that leads to prejudice implicates the Sixth Amendment.   "Failure to raise a losing argument, whether at trial or on appeal, does not constitute ineffective assistance of counsel." *Stone v. Farley*, 86 F.3d 712, 717 (7th Cir. 1996) (citing *Strickland*, 466 U.S. at 687).

Insofar as his petition for habeas corpus is based on ineffective assistance of appellate counsel, Ashburn's petition is **DENIED**.

### 2. *Right to a Fair and Impartial Jury (Claim 3)*

Ashburn's next claim is that his Constitutional right to a fair and impartial jury was denied.   According to Ashburn, the trial court should have granted him a mistrial based on a juror's exposure to a prejudicial article in a local newspaper.   Ashburn appealed the issue in his 1997 direct appeal, where the appellate court agreed

> that the article was prejudicial; however, the [trial] court ascertained that [the juror Ashburn claims should have been stricken] had not read the article.   There is no need to further question a juror regarding prejudice if the juror has not read the article.   The [trial] court adequately guarded [Ashburn's] right to a fair trial when it repeatedly admonished the jurors not to read or listen to any news media about the trial.

(Doc. 13-1, p. 22).

The appellate court's conclusion is reasonable.  The record indicates the trial court, after becoming aware of the prejudicial article, examined one juror in chambers, made sure he had not discussed the article with the rest of the jurors, and replaced him.  Another juror who saw the local paper had run an article on Ashburn was questioned by the trial court, who concluded that juror had not even read the article.  The other jurors, the trial court found, had not been exposed to the article.  It is reasonable that the appellate court affirmed the findings and course of action of the trial judge, who was under an obligation only to determine the circumstances, impact upon the jurors, and possible prejudicial effect of the article.  *Oswald v. Bertrand*, 374 F.3d 475, 477–78 (7th Cir. 2004).

Further, succeeding on his instant claim would require Ashburn to show, by clear and convincing evidence, that the trial court made an incorrect finding that the jurors were telling the truth regarding whether they did or did not read the prejudicial article.  As the respondent points out, that kind of credibility finding is entitled to great deference.  See *Burns v. Hompe*, 339 F. App'x 624, 629 (7th Cir. 2009) (affirming a § 2254 denial because petitioner "has not met his stringent burden of showing [that the state courts'] factual determinations were

without support."); *id.* ("the initial factfinder . . . is in the best position to make" credibility determinations) (citing *Murrell v. Frank*, 332 F.3d 1102, 1112 (7th Cir. 2003).   And here, Ashburn has adduced no evidence to rebut the presumption that the trial court was correct.  *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008).

Nor does the appellate court's decision run contrary to or unreasonably apply federal law.  Instead, as discussed above, it comports with the edict that the judge must, if aware of a potential source of bias, inquire into the circumstances, impact and possible prejudice of that source.  *Oswald*, 374 F.3d at 477–78.  The appellate court was satisfied that the trial court did just that.

Insofar as his petition for habeas corpus is based on his right to be tried by a fair and impartial jury, Ashburn's petition is **DENIED**.

### 3. Admission of Prejudicial Evidence (Claim 4)

Ashburn's next claim is that his Due Process rights were violated when "the State was allowed to introduce irrelevant and prejudicial evidence" at trial over his objection.  Ashburn does not specify just what that prejudicial evidence is, but the Court will assume he is referring to the knife, knife box, and knife purchase receipt that the Illinois appellate court (on direct appeal) concluded were prejudicial and irrelevant — but because "the evidence against [Ashburn] was overwhelming," the appellate court found the error harmless (Doc. 13-1, p. 25).

Because a state court's evidentiary rulings turn on state law, they are usually beyond the scope of § 2254 review.  *Perrequet v. Briley*, 390 F.3d 505, 511 (7th Cir. 2004).  But state defendants do have a Fourteenth Amendment due process right to a fundamentally fair trial, a right that is cognizable under habeas review.  *Id.*  While Ashburn invokes the Due Process Clause in his instant petition, he failed to do so in his direct appeal.  His brief there contained several references to state common law in an effort to show evidentiary rules were violated, but no constitutional analysis (other than a conclusory statement that the evidence's prejudicial nature denied him a fair trial).  (*See* Doc. 13-1, 50–53).

Here, given the entirety of the record and the rulings of the State courts, the Court cannot say Ashburn was denied a fair trial.  Habeas relief is appropriate only if an erroneous evidentiary ruling was so prejudicial that it compromises a petitioner's due process right to a fair trial.  *Anderson v. Sternes*, 243 F.3d 1049, 1053 (7th Cir. 2001).  Only if the state court committed an error so serious as to render it likely that an innocent person was convicted can the error be described as a deprivation of due process.  *Id.*  The Illinois appellate court, though its analysis focused on state law, was satisfied that, compared to the weight of the evidence against Ashburn, the admission of the prejudicial evidence was harmless.  (Doc. 13-1, p. 25).  This Court agrees, and concludes that the evidentiary error was insufficient to deny Ashburn his due process protections. As the state court concluded when denying Ashburn's PCR appeal, the evidence of Ashburn's guilt (including the litany of witnesses who testified in detail about the

myriad confrontations between Ashburn and Muckenstrum) was "overwhelming." (Doc. 13-1, pp. 3–4, 25).  See *Garth v. Davis*, 470 F.3d 702, 712 (7th Cir. 2006) ("In a habeas proceeding, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict.").  The state court found — and this Court agrees — that the evidentiary error did not make it likely Ashburn was wrongly convicted.  The admission of the controversial evidence fails to rise to a due process violation.  See *Anderson*, 243 F.3d at 1054 ("[N]ot every evidentiary error constitutes a denial of due process.").

Insofar as it is premised on the idea that the introduction of irrelevant and prejudicial evidence denied him his Due Process rights, Ashburn's petition for habeas corpus is **DENIED.**

### 4. *Prosecutorial Misconduct – Earl Kelly's Testimony (Claim 5)*

Ashburn's next claim is that his rights to Due Process and a Fair Trial were denied when "the State allowed witness Earl Patrick Kelly" to give testimony it knew to be false and did not correct this false testimony.

The claim implicates two sets of controlling cases.  The Court will first turn to *Napue v. Illinois*, 360 U.S. 264 (1959), which speaks to cases where a petitioner alleges the prosecutor has knowingly introduced perjured testimony. Ashburn's instant reply brief is guided by the *Napue* analysis.  Then the Court will address Ashburn's claims as they potentially relate to *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), which speak to cases in which the prosecution has suppressed exculpatory evidence.  Ashburn

does not rely on *Brady* or *Giglio* in his instant petition (*Giglio* is cited once in his reply).  But the trial court on his state PCR petition did address his claim of prosecutorial misconduct under *Brady* (*See* Doc. 13-5, 2–3), so the Court will assume Ashburn's instant claim invokes *Brady* too.

The evidence Ashburn claims should have been disclosed is (similar to *Giglio*) evidence that, in return for his testimony against Ashburn, Earl Kelly had a leniency agreement with federal prosecutors regarding a federal claim against Kelly.  While Ashburn adduces a new affidavit (from Kelly's former federal public defender) that supports that contention, he cannot prevail here because the Illinois courts reasonably applied *Napue* and made a *Brady / Giglio* materiality determination that was also reasonable.

### a. *Napue v. Illinois*

Under *Napue*, a defendant's constitutional rights are violated if (1) the prosecution's case included perjured testimony; (2) the prosecution knew or should have known of the perjury; and (3) there is any likelihood that the false testimony could have affected the jury's judgment.  *United States v. Adcox*, 19 F.3d 290, 295 (7th Cir. 1994).

Insofar as he invokes *Napue*, Ashburn's argument fails because the appellate court reasonably determined that Kelly did not perjure himself.  (*See* Doc. 13, p. 6).  While the newly-adduced affidavit (Doc. 19, pp. 21–22) asserts that Kelly was pursuing "the time-worn practice of" getting his sentence reduced via government cooperation, that does not contradict what Kelly said on the stand.

Kelly freely admitted "he did not tell the authorities about his conversation with [Ashburn] until . . . a couple of months before he was sentenced in Federal court. [He] stated he would have taken anything the authorities wanted to give him." (Doc. 13-1, p. 18).

Likewise — and under *Napue* just as critically — the record does not contradict what the Illinois courts found the state prosecutors knew about Kelly's cooperation. At a 2006 evidentiary hearing for postconviction relief, two former state prosecutors testified that no promises of leniency were made to Kelly, and that no perjury had been suborned from Kelly. (Doc. 13-1, p. 2). At that hearing, witnesses also testified that "it was understood that [Kelly's] cooperation would be brought to the" U.S. Attorney's attention, and that occasionally the U.S. Attorney had reduced a defendant's sentence. (*Id.*). While the newly-submitted affidavit does cast some doubt on the extent of just what Kelly thought he would get out testifying against Ashburn, it does nothing to suggest that prosecutors knew or should have known Kelly was perjuring himself. The trial court, on Ashburn's PCR petition, ruled as follows:

> . . . Sgt. Dennis Higgins, an Illinois State Police investigator, wrote a letter to the Prosecutor in witness Kelly's Federal case requesting that he file an extension to file a Rule 35 Motion. Petitioner alleged that this letter was not disclosed to trial counsel Wallis.
>
> Keith Jansen and Dennis Hatch (St. Clair County Prosecutors at the time of Ashburn's trial) both testified that they were not aware of the letter. Both men also testified that although they could not definitively state that trial counsel Wallis was aware of the letter they were certain that he was aware of its purpose, which was to maintain the possibility of favorable treatment for witness Kelly. (Doc. 13-5, 2–3).

Quite simply, Ashburn has adduced no evidence that the former prosecutors were lying during the 2006 hearing or ever knew Kelly was perjuring himself (if, indeed, he was). As such, a mandatory element of the *Napue* test — that prosecutors knew or should have known about a perjury — is not met here. This Court cannot conclude that the appellate court's decision is contrary to, or an unreasonable application of *Napue*.

The Court notes that the state courts did not have the benefit of seeing the newly-adduced affidavit of Andrea Smith, Earl Kelly's public defender for his federal criminal cases. (Doc. 19, pp. 19–22). That affidavit suggests that there was some likelihood that Kelly knew there was a probability he would "get a sentence reduction if his information was good, believed by the government." The Supreme Court has recently held that federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1399 (2011). Smith's affidavit is therefore "irrelevant to § 2254(d)(1) review," *id.*, and cannot support a finding that the Illinois courts' decisions were contrary to or involved an unreasonable application of federal law, 28 U.S.C. § 2254(d)(1), or (more obviously) that the state courts' determination "of the facts in light of the evidence presented in the State court proceeding" was unreasonable. See also *Morgan v. Hardy*, 662 F.3d 790, 805 (7th Cir. 2011) ([E]ven if a leniency agreement existed, it does not follow that [a prosecution witness's] trial testimony was false.").

Where — as here, where Ashburn introduces new facts in the form of an affidavit — a petitioner has failed to develop the factual basis of his claim in state court, the Court is generally forbidden from holding an evidentiary hearing on the claim.  28 U.S.C. § 2254(e)(2); *Holland v. Jackson*, 542 U.S. 649, 652–53 (2004).  The Court does have discretion to hold such a hearing, but only if (as pertinent here) the new facts "could not have been previously discovered through the exercise of due diligence," § 2254(e)(2)(A)(ii), and "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, *no reasonable factfinder would have found the applicant guilty of the underlying offense,* § 2254(e)(2)(B) (emphasis added).  The newly-introduced affidavit cannot meet that high threshold.  Due diligence could have unearthed more facts relating to any potential deal between Kelly and prosecutors.  As the trial court found on Ashburn's PCR petition, "the record shows that trial counsel . . . was fully aware of witness Kelly's criminal history *and his Federal case situation*." (Doc. 13-5, 2) (emphasis added).  And even assuming *arguendo* that Kelly's testimony had been perjured, a reasonable factfinder could have found Ashburn guilty: his union cards, fishing licenses, and hunting license were found on the ground by Rick Muckenstrum's body; and over ten witnesses detailed the conflict between Ashburn and Muckenstrum, saw the two together the day before Muckenstrum's corpse was discovered, and detailed Ashburn's ownership, possession of, and brandishing (in Muckesntrum's

direction, the day before Muckenstrum's body was found) the same caliber gun that was used to kill Muckenstrum.

The question here is whether Ashburn has — by clear and convincing evidence — rebutted the state court's factual finding that Kelly did not perjure himself *and* that prosecutors knew it.  See *Ben-Yisrayl v. Buss*, 540 F.3d 542, 546 (7th Cir. 2008).  Ashburn has not made that showing, nor has he shown the state courts rulings unreasonably applied *Napue*.  He is therefore not entitled to habeas relief.

### b. *Brady* and *Giglio*

Under *Brady* and *Giglio*, a defendant's due process is violated if (1) the evidence at issue is favorable to the accused, either by being exculpatory or impeaching; (2) the evidence was willfully or inadvertently suppressed by the government; and (3) there is a reasonable probability that prejudice ensued — in other words, materiality.  *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008).  Ashburn's argument fails to trigger the materiality prong.

Ashburn took his concerns to the Illinois courts in his petition for postconviction relief, where he also argued that his trial counsel had been ineffective in not properly investigating or cross-examining Kelly.  Relative to (what it saw as) the strong case against Ashburn, the Illinois appellate court gave little weight to Kelly's testimony: "given the overwhelming evidence of [Ashburn's] guilt in [Muckenstrum's] murder and given the parade of other witnesses who testified, in detail, about the confrontations between [Ashburn] and [Muckenstrum] prior to

the murder, *Kelly's testimony played a very small part in the overall case against* [Ashburn]." (Doc. 13-1, 3–4) (emphasis added). In other words, there was not a reasonable probability that the trial outcome would have been different had more evidence of an agreement between Kelly and prosecutors been disclosed.

Further, Kelly's credibility was assailed by the defense, and the jury knew he had first come forward while awaiting sentencing in another case. (*See* Doc. 13-14, pp. 61–68). The appellate court noted "that the defendant's counsel examined Kelly extensively about what kind of leniency Kelly might hope to get in his own case as a result of his testimony . . . and that on redirect [the prosecutor] questioned Kelly in even greater detail about whether he had received any promises or special consideration." (Doc. 13-1, 3–4). See *Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004) ("[C]onsidering the laundry list of bad acts attributable to [the prosecution's witness] that was before the jury, [the petitioner] failed to establish that the false testimony could have affected the judgment of the jury."). Given the numerous witnesses against Ashburn and the fact that Kelly had already been impeached regarding the relationship between his sentencing and his testimony, this Court cannot conclude that the Illinois courts' factual findings were unreasonable. See 28 U.S.C. § 2254(d).

The Illinois appellate court reasonably applied the facts to come to a decision that this Court cannot say was "contrary to" *Brady*. The appellate court made a materiality finding that comports with *Brady* and *Giglio*, and its factual

determination in doing so was reasonable.  Insofar as it is premised on a claim

that the prosecution violated his Due Process rights under *Napue*, *Brady* and

*Giglio*, Ashburn's petition for habeas corpus is **DENIED.**

### 5.  *Prosecutorial Misconduct – Dr. Harry Parks' Testimony (Claim 6)*

Ashburn's next claim is that his Due Process rights were violated

when the State elicited perjured testimony from Dr. Harry Parks.   Though

Ashburn does not, in his habeas petition, specify just what testimony he is

contesting, the Court will assume that he is raising the same issue as he did in his

PCR petition:

> That the prosecutor suborned and elicited perjured testimony from
> pathologist Harry William Parks.  Dr. Parks' testimony at the trial . . .
> with regard to the time that the victim's body was found, the stage of
> rigor mortis in the victim's body, and the estimate of the time of
> death was directly contradictory to Dr. Park's previous testimony in
> [Ashburn's codefendant's trial]. . . .  This perjured testimony was
> intentionally manufactured and elicited in order to deprive [Ashburn]
> of an alibi which would have established that [he] was not with the
> victim at the time of the victim's death.  Had Dr. Parks' testimony
> been consistent with [his testimony in Clark's case], petitioner would
> have been able to establish that he was with on David Berger the
> entire day that it is alleged the victim was killed.

As discussed above, the Court can only grant habeas relief if the Illinois courts

made a ruling contrary to federal law, or based on an unreasonable determination

of fact.   The controlling case is *Napue*, which requires a showing that (1) the

prosecution's case included perjured testimony; (2) the prosecution knew, or

should have known, of the perjury; and (3) a likelihood that the false testimony

affected the jury's judgment.  *United States v. Saddeh*, 61 F.3d 510, 523 (7th Cir.

1995).

During Clark's trial, Parks estimated that Muckenstrum died "sixteen or eighteen hours prior to the autopsy," which occurred around noon the day after Muckenstrum's body was found. (Doc. 13-4, pp. 43–44). During Ashburn's trial, Parks testified that he did not make any conclusions concerning Muckenstrum's time of death. (Doc. 13-4, p. 71). Such inconsistencies are insufficient to establish the government's knowing use of false testimony. *Simental v. Matrisciano*, 363 F.3d 607, 615 (7th Cir. 2004). Further, Ashburn's counsel had ample opportunity to impeach Parks during cross-examination. See *id.* ("[W]hen a defendant alleges that the prosecution used perjured testimony, we must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination."). And finally, the only testimony with regard to Muckenstrum's time of death in Ashburn's trial came in response to defense counsel's questions — the prosecution never even asked about Muckenstrum's time of death. (*See* Doc. 13-4, pp. 49–66; pp. 83–85). It is a novel theory indeed that the prosecution — by *not* asking *any* questions about Muckenstrum's time of death — was eliciting false testimony from Dr. Parks so as to deprive Ashburn of an alibi.

Insofar as it is premised on the claim that his rights were denied when the prosecution elicited perjured testimony from Dr. Parks, Ashburn's petition for habeas corpus is **DENIED.**

### 6. Due Process — the State Included "A Different Theory of Offense" in the Jury Instructions (Claim 7)

Ashburn's final claim is that the State "broadened the indictment to include a different theory of offense in the jury instructions after the evidence was closed."   Though Ashburn invokes the Fifth Amendment, no federal right to a grand jury exists in state prosecutions.  *Bae v. Peters*, 950 F.2d 469, 477 (7th Cir. 1991) (citing *Hurtado v. California*, 110 U.S. 516 (1884)). So the Fourteenth Amendment's Due Process Clause (which Ashburn does invoke, if broadly) is the federal provision properly raised here.   Due process prevents a criminal defendant from being convicted of an offense except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  Illinois courts have held that, when there is a variance between an indictment and the jury instructions, there is no due process violation unless the variance exposes the defendant to double jeopardy or misled the defendant.  See *Jenkins v. Nelson*, 147 F.3d 485, 498–99 (7th Cir. 1998).

In Illinois, a person charged as a principal can be convicted upon evidence showing that he was in fact only an aider or abetter.  *People v. Doss*, 426 N.E.2d 324, 327 (Ill. App. Ct. 1981); *Bradley v. Gaetz*, No. 05-cv-0712-DRH, 2009 WL 691261 (S.D. Ill. March 13, 2009).   The Illinois appellate court reasoned in denying Ashburn's PCR appeal, "accountability is not an additional element of the charge of murder: rather . . . it is an alternative means by which a conviction for an underlying crime may be reached."  (Doc. 13-1, p. 9) (citing *People v. Hicks*, 181 Ill. 2d 541, 547 (1998)).  "Even the slightest evidence in

support of a theory of accountability warrants the use of an accountability jury instruction." (*Id.*) (citing *People v. Testa*, 261 Ill. App. 3d 1025, 1030 (1994)). "There is *no requirement* that an indictment allege accountability." (*Id.*) (citing *People v. Bates*, 16 Ill. 2d 290, 295 (1959) (emphasis added)).

Ashburn does not claim he did not have notice of the jury instructions, or that he was misled by the variance between the jury instructions and the indictment (a variance that was proper), or that he was subject to double jeopardy. His due process rights were not denied. See *Garth v. Davis*, 470 F.3d 702 (7th Cir. 2006) (accomplice liability presented via jury instructions does not offend federal due process). Insofar as it is based on a theory that the State "improperly broadened the indictment," Ashburn's instant petition is **DENIED**.

## IV.   <u>Certificate of Appealability</u>

The district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant. Rule 11(a), RULES GOVERNING SECTION 2254 CASES. A COA may issue only if the applicant has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the Court denies a petitioner's § 2254 petition on the merits and not merely for procedural reasons, the showing required to satisfy §2253(c) is straightforward: the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Because a reasonable jurist may find the Court's decisions with respect to Ashburn's constitutional

claims debatable, the Court grants a certificate of appealability on all claims *except* his claim that his trial counsel was ineffective.

## V.    <u>Conclusion</u>

For the reasons discussed above, Petitioner John Ashburn's § 2254 Habeas Petition (**Doc. 1**) is **DENIED**.  Consequently, Ashburn's "Motion for Status of Case" (**Doc. 22**) is **MOOT.**

**IT IS SO ORDERED.**

**DATED: September 18, 2012**

Digitally signed by
David R. Herndon
Date: 2012.09.18
14:50:01 -05'00'

**Chief Judge**
**United States District Court**